17-2654-cv
Coalition for Competitive Electricity, et al. v. Zibelman, et al.

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2017
No. 17-2654-cv

COALITION FOR COMPETITIVE ELECTRICITY, DYNERGY INC., EASTERN GENERATION, LLC, ELECTRIC POWER SUPPLY ASSOCIATION, NRG ENERGY, INC., ROSETON GENERATING LLC, SELKIRK COGEN PARTNERS, L.P.,
*Plaintiffs-Appellants*,

*v.*

AUDREY ZIBELMAN, IN HER OFFICIAL CAPACITY AS CHAIR OF THE NEW YORK PUBLIC SERVICE COMMISSION, PATRICIA L. ACAMPORA, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW YORK PUBLIC SERVICE COMMISSION, GREGG C. SAYRE, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE NEW YORK PUBLIC SERVICE COMMISSION DIANE X. BURMAN, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW YORK PUBLIC SERVICE COMMISSION,
*Defendants-Appellees*,

EXELON CORP., R.E. GINNA NUCLEAR POWER PLANT LLC, CONSTELLATION ENERGY NUCLEAR GROUP, LLC, NINE MILE POINT NUCLEAR STATION LLC,
*Intervenor-Defendants-Appellees*.

ARGUED: MARCH 12, 2018
DECIDED: SEPTEMBER 27, 2018

Before:     JACOBS, LIVINGSTON, *Circuit Judges*, CHEN, *District Judge*.[1]

---

[1] Judge Pamela K. Chen, of the United States District Court for the Eastern District of New York, sitting by designation.

Plaintiffs, a group of electrical generators and trade groups of electrical generators, appeal from a judgment of the United States District Court for the Southern District of New York (Caproni, J.) granting Defendants' Rule 12(b)(6) motions to dismiss. Plaintiffs challenge the constitutionality of New York's Zero Emissions Credit ("ZEC") program, which subsidizes qualifying nuclear power plants with "ZECs": state-created and state-issued credits certifying the zero-emission attributes of electricity produced by a participating nuclear plant.

Plaintiffs argue that the program is preempted under the Federal Power Act ("FPA") and that it violates the dormant Commerce Clause. We conclude as follows: (1) the ZEC program is not field preempted because Plaintiffs have failed to identify an impermissible "tether" under Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288, 1293 (2016), between the ZEC program and wholesale market participation; (2) the ZEC program is not conflict preempted because Plaintiffs have failed to identify any clear damage to federal goals; and (3) Plaintiffs lack Article III standing to raise a dormant Commerce Clause claim. Affirmed.

DONALD B. VERRILLI, JR., Munger Tolles & Olson LLP, Washington, DC; Henry Weissmann, Fred A. Rowley, Jr., Mark R. Yohalem, Munger, Tolles & Olson LLP, Los Angeles, California; Jonathan D. Schiller, David A. Barrett, Boies Schiller Flexner LLP, New York, New York; Stuart H. Singer, Boies Schiller Flexner LLP, Fort Lauderdale, Florida, for Plaintiffs-Appellants.

SCOTT H. STRAUSS (Peter J. Hopkins, Jeffrey A. Schwarz, Amber L. Martin, on the brief), Spiegel & McDiarmid LLP, Washington, DC; Paul Agresta, General Counsel, John Sipos, Deputy General Counsel, John C.

2

Graham, Public Service Commission of the State of New York, Albany, New York, <u>for Defendants-Appellees</u>.

MATTHEW E. PRICE (David W. DeBruin, Zachary C. Schauf, William K. Dreher, <u>on the brief</u>), Jenner & Block LLP, Washington, DC, <u>for Intervenors-Defendants-Appellees</u>.

Aaron M. Panner, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC, <u>for amici curiae</u> Energy Economists, <u>in support of</u> Plaintiffs-Appellants.

Ben Norris, American Petroleum Institute, Washington, DC; Dena Wiggins, Natural Gas Supply Association, Washington, DC, <u>for amici curiae</u> American Petroleum Institute, Natural Gas Supply Association <u>in support of</u> Plaintiffs-Appellants.

Jeffrey W. Mayes, General Counsel, Monitoring Analytics, LLC, Eagleville, Pennsylvania, <u>for amicus curiae</u> Independent Market Monitor for PJM, <u>in support of</u> Plaintiffs-Appellants.

Ari Peskoe, Harvard Law School Environmental Policy Initiative, Cambridge, Massachusetts, <u>for amici curiae</u> Electricity Regulation Scholars <u>in support of</u> Defendants-Appellees.

Richard L. Revesz (Bethany A. Davis Noll, Avi Zevin, <u>on the brief</u>), Institute for Policy Integrity at New York University School of

3

Law, New York, New York, <u>for amicus curiae</u> Institute for Policy Integrity, <u>in support of</u> Defendants-Appellees.

Thomas Zimpleman (Miles Farmer, <u>on the brief</u>), Natural Resources Defense Council, Washington, DC; Michael Panfil, Environmental Defense Fund, Washington, DC, <u>for amici curiae</u> Natural Resources Defense Council, Environmental Defense Fund, <u>in support of</u> Defendants-Appellees.

Jonathan M. Rund (Ellen C. Ginsberg, <u>on the brief</u>), Nuclear Energy Institute, Washington, DC, <u>for amicus curiae</u> Nuclear Energy Institute, <u>in support of</u> Defendants-Appellants.

Clare E. Kindall, Assistant Attorney General (Seth A. Hollander, Assistant Attorney General, <u>on the brief</u>), <u>for</u> George Jepsen, Attorney General of Connecticut, New Britain, Connecticut; M. Elaine Meckenstock, Deputy Attorney General (Kathleen A. Kenealy, Chief Assistant Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Sally Magnani, Senior Assistant Attorney General, Gavin G. McCabe, Supervising Deputy Attorney General, Melinda Piling, Deputy Attorney General, Myung J. Park, Deputy Attorney General, Dennis L. Beck, Jr., Deputy Attorney General, <u>on the brief</u>), <u>for</u> Xavier Becerra, Attorney General of California, Oakland, California, <u>for amici curiae</u> States of California, Connecticut, Illinois,

4

Massachusetts, New York, Oregon, Vermont, and Washington, in support of Defendants-Appellees.

Samuel T. Walsh, Harris, Wiltshire & Grannis LLP, Washington, DC, for amici curiae Independent Economists, in support of Defendants-Appellees.

Julia Dreyer (Gene Grace, on the brief), American Wind Energy Association, Washington, DC, for amicus curiae American Wind Energy Association, in support of neither party.

DENNIS JACOBS, *Circuit Judge*:

Plaintiffs, a group of electrical generators and trade groups of electrical generators, appeal from a judgment of the United States District Court for the Southern District of New York (Caproni, J.) granting Defendants' Rule 12(b)(6) motions to dismiss. In August 2016, the New York Public Service Commission ("PSC") adopted the Zero Emissions Credit ("ZEC") program as part of a larger energy reform plan to reduce greenhouse-gas emissions by 40 percent by 2030. The program subsidizes qualifying nuclear power plants by creating "ZECs": state-created and state-issued credits certifying the zero-emission attributes of electricity produced by a participating nuclear plant. The PSC has determined that three nuclear power plants (FitzPatrick, Ginna, and Nine Mile Point) qualify for the ZEC program; other facilities, including facilities located outside New York, may be selected in the future.

Plaintiffs allege that the ZEC program influences the prices that result from the wholesale auction system established by the Federal Energy Regulatory Commission ("FERC") and distorts the market mechanism for determining which energy generators should close. Plaintiffs challenge the program's constitutionality on two grounds: that the program is preempted under the Federal Power Act ("FPA") and that it violates the dormant Commerce Clause.

Defendants, who are members of the PSC, and Intervenors, who are the nuclear generators (and their owners, including Exelon Corporation) receiving ZECs, moved to dismiss on the grounds that Plaintiffs lack a private cause of action to pursue their preemption claims because the FPA implicitly forecloses equity jurisdiction, and that (in any event) Plaintiffs' claims fail as a matter of law.

We conclude that the ZEC program is not field preempted, because Plaintiffs have failed to identify an impermissible "tether" under Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288, 1293 (2016) between the ZEC program and wholesale market participation; that the ZEC program is not conflict preempted, because Plaintiffs have failed to identify any clear damage to federal goals; and that Plaintiffs lack Article III standing as to the dormant Commerce Clause claim. These conclusions are consistent with the recent Seventh Circuit decision in Elec. Power Supply Ass'n v. Star, No. 17-2433, 2018 WL 4356683, at *1 (7th Cir. Sept. 13, 2018).

The judgment of the district court is affirmed.

**I**

**A**

The FPA establishes a collaborative scheme between the states and federal government to regulate electricity generation. States have exclusive jurisdiction over "facilities used for the generation of electric energy," including production and retail sales. 16 U.S.C. § 824(b)(1). FERC regulates electricity sales at wholesale, ensuring "rates and charges made, demanded, or received . . . for or in connection with" such sales are "just and reasonable." Id. § 824d(a).

FERC has determined that just and reasonable rates for wholesale electricity should be set by competitive auctions. The New York Independent System Operator ("NYISO") manages two types of wholesale auctions under FERC-approved rules and procedures: energy and capacity. In energy auctions, generators bid the lowest price they will accept to sell a given quantity of electrical output; in capacity auctions, generators bid (and NYISO purchases) options to call upon the generator to produce a specified quantity of electricity in

the future.  Both types of auction employ "stacking" of bids from lowest to highest price until demand is satisfied.  App'x 50, 54 (Compl. ¶¶ 33, 39-40).  The price of the highest-stacked bid sets the "market clearing price."  Id.  Any generator that bids at or below the market clearing price "clears" the auction and receives the market clearing price, regardless of the price the generator actually bid.  Id.  "A high clearing price in the capacity auction encourages new generators to enter the market, increasing supply and thereby lowering the clearing price . . . .  [A] low clearing price discourages new entry and encourages retirement of existing high-cost generators."  Hughes, 136 S. Ct. at 1293.

Nuclear generators bid into the NYISO auctions as price-takers: since, unlike other types of electricity generation, they are unable to vary their output depending on price, they sell their entire output at the market clearing price, even if the price is below the cost of production.

**B**

In August 2016, the PSC issued the Clean Energy Standard ("CES") Order as an overall scheme to reduce greenhouse-gas emissions by 40 percent by 2030. The CES Order created two programs that bear upon this appeal: Renewable Energy Credits ("RECs") and ZECs.  Plaintiffs challenge only the ZEC program, arguing that it is preempted by the FPA and violates the dormant Commerce Clause.

The REC program awards to generators one REC for each megawatt-hour (MWh) of energy that is produced from renewable sources like wind and solar. App'x 190 (CES Order at 106).  The New York State Energy Research and Development Authority ("NYSERDA") purchases RECs from generators, thereby providing them a subsidy.  App'x 100 (CES Order at 16).  In turn, NYSERDA sells the RECs to local utilities that sell energy to consumers at retail. Id.  The CES Order requires the utilities either to purchase RECs in an amount based on the percentage of the total load served by that utility or to make an alternative compliance payment.  App'x 98-100 (CES Order at 14-16).  The utilities may (and no doubt do) pass on the cost of RECs to consumers.  App'x 101 (CES Order at 17).

The ZEC program aims to prevent nuclear generators that do not emit carbon dioxide from retiring until renewable sources of energy can pick up the slack. A ZEC is a subsidy: a "credit for the zero-emissions attributes of one megawatt-hour of electricity production by" a participating nuclear power plant. App'x 254. The PSC selects plants for the ZEC program based on five criteria: (1) "verifiable historic contribution . . . to the clean energy resource mix . . . in New York"; (2) the degree to which projected wholesale revenues are insufficient to prevent retirement; (3) costs and benefits of ZECs relative to clean-energy alternatives; (4) impacts on ratepayers; and (5) the public interest. App'x 208 (CES Order at 124). Based on these criteria, the PSC chose three nuclear plants for the ZEC program: FitzPatrick, Ginna, and Nine Mile Point; it is asserted that other facilities, including facilities located outside New York, may be selected in the future. App'x 209 (CES Order at 125).

The ZEC price is based on the so-called "social cost of carbon": a federal inter-agency task force's estimate of the damage from carbon emissions, which the PSC uses to measure the hypothetical environmental damage from nuclear plants' retirement. App'x 215 (CES Order at 131).[2] The PSC then subtracts the portion of that cost already captured through New York's participation in the Regional Greenhouse Gas Initiative ("RGGI"), and multiplies the result by the tons of carbon avoided per MWh of zero-emission energy. App'x 219-20 (CES Order at 135-36). The ZEC price generated for the program's first two years is $17.48. App'x 69 (Compl ¶ 70). Accordingly, "each qualifying nuclear generator will get an additional $17.48 for each MWh of electricity it generates (subject to a possible cap), in addition to the price the facility receives for the sale of the electricity and capacity in the [NYISO] market." Id.

Beginning in 2019, the PSC intends to calculate a new ZEC price every two years. The price may be reduced based on two considerations. First, if the New York energy market experiences "additional renewable energy penetration," App'x 221 (CES Order at 137), the price will fall, reflecting the reduced value of nuclear plants if renewable energy generation gains steam. Second, the ZEC price may be adjusted downward based on forecast wholesale prices. App'x 222

_____

[2] See generally Jason Bressler, Note, *Blocking Interstate Natural Gas Pipelines: How to Curb Climate Change While Strengthening the Nation's Energy System*, 44 COLUM. J. ENVTL. L. (forthcoming Jan. 2019).

8

(CES Order at 138).  For each two-year period, the PSC calculates a "reference price forecast" that is equal to the sum of forecast NYISO "Zone A" (i.e., Western New York) energy and capacity prices during the period.  Id.  The reference price forecast is not paid to the ZEC plants, but rather sets a benchmark for reducing the ZEC price: if the reference price forecast exceeds $39/MWh (a historical approximation of Zone A energy and capacity prices), the two-year ZEC price is reduced by the difference.  Id.

As in the REC program, the NYSERDA purchases ZECs from the selected plants, and local utilities are required to purchase ZECs from NYSERDA in proportion to its share of total state electric load.  App'x 70-71 (Compl. ¶ 73). Alternatively, the utilities may purchase both ZECs and energy directly from the generators.  App'x 235-36 (CES Order at 151-52).  The utilities may then pass along these costs to consumers.

## C

The complaint, filed October 19, 2016, alleges that the ZEC program alters the prices that result from FERC's auction system and distorts the market mechanism for determining which nuclear power plants should close.  The subsidized nuclear generators receive the value of the ZECs in addition to what they earn in the wholesale markets; as a result (it is alleged), New York "is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices, which one group of experts estimated at $15 billion over 12 years."  App'x 58-59 (Compl. ¶ 47).  Plaintiffs claim that the depressive effect will cause (1) generators (such as themselves) to receive a lower price than they would have otherwise and, as a result, (2) their bids to fail to clear auctions when they otherwise would have cleared.  App'x 71, 74 (Compl. ¶¶ 74, 87).

Accordingly, the complaint claims that the ZEC portion of the CES Order is both field and conflict preempted by FERC's authority over wholesale electricity sales, and that it violates the dormant Commerce Clause because the ZECs benefit only nuclear power plants located in New York.  App'x 42-43 (Compl. ¶¶ 7-8).  The nuclear plants (and their owners), beneficiaries of the ZEC program, intervened as a Defendant.

9

The district court granted the motions by Intervenors and the state Defendants to dismiss under Rule 12(b)(6).  As to the preemption claim, the court held that the FPA forecloses parties from invoking equity jurisdiction to bring a claim under the FPA, and that, in any event, Plaintiffs failed to state a plausible claim.  As to the Commerce Clause claim, the court held that Plaintiffs lack a cause of action because their alleged injuries did not fall within the zone of interests protected by the dormant Commerce Clause; as to the merits, the court held the Plaintiffs' claim fails because New York was acting as a market participant, rather than a regulator, when it created ZECs.

This appeal followed.

## II

We review <u>de novo</u> a district court's grant of a motion to dismiss under Rule 12(b)(6), "construing the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor." <u>Nicosia v. Amazon.com, Inc.</u>, 834 F.3d 220, 230 (2d Cir. 2016).  The complaint must "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>  For Rule 12(b)(6) purposes, the complaint "include[s] any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." <u>Allco Finance Ltd. v. Klee</u>, 861 F.3d 82, 97 n.13 (2d Cir. 2017) (internal quotation marks omitted).

## III

Plaintiffs invoke the court's equity jurisdiction to prevent enforcement of the CES Order on the ground that it is preempted by the FPA, while Defendants argue that such jurisdiction is implicitly foreclosed by the same statute. <u>See</u> <u>Armstrong v. Exceptional Child Center</u>, 135 S. Ct. 1378 (2015).  However, as the Seventh Circuit recognized in <u>Electric Power Supply Association</u>, this dispute does not implicate the district court's subject-matter jurisdiction, which rests securely on 18 U.S.C. § 1331 and 16 U.S.C. § 825p. <u>See</u> 2018 WL 4356683, at *1.

10

We need not consider the parties' disagreement regarding equity jurisdiction because we conclude (as did the Seventh Circuit) that federal law does not preempt the state statute -- that is, since Plaintiffs' claims fail either on the merits or for lack of standing, the question regarding equity is obviated.

## IV

The laws of the United States are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2. Congress therefore may preempt state law through federal legislation. "Our inquiry into the scope of a [federal] statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." Altria Group, Inc. v. Good, 555 U.S. 70, 76 (2008) (internal quotation marks omitted).

If Congress has not expressly preempted a state statute, it may do so implicitly through either "field" or "conflict" preemption. Under field preemption, a state law is preempted if "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan., 489 U.S. 493, 509 (1989). Conflict preemption arises "where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Oneok, Inc. v. Learjet, Inc., 135 S. Ct. 1591, 1599 (2015) (internal quotation marks omitted). Plaintiffs challenge the ZEC program on both scores. We consider field preemption first and conflict preemption next.

## V

The FPA divides responsibility for regulating energy between the states and the federal government. FERC has exclusive power to regulate "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C § 824(a). FERC must ensure that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission . . . shall be just and reasonable." 16 U.S.C. § 824d(a). While FERC's authority extends to "rules or practices affecting

11

wholesale rates," this affecting jurisdiction is limited to "rules or practices that *directly* affect the [wholesale] rate" so that FERC's jurisdiction does not "assum[e] near-infinite breadth." FERC v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 774 (2016) (internal quotation marks omitted) (emphasis and alteration in original).

However, "the law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale'—most notably, any retail sale—of electricity." Id. at 766 (quoting 16 U.S.C. § 824(b)). The states are thus authorized to regulate energy production, 16 U.S.C. § 824(b), and facilities used for the generation of electric energy, 16 U.S.C. § 824(b)(1). See Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n, 461 U.S. 190, 205 (1983) ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States.").

When "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." New York State Dept. of Social Servs. v. Dublino, 413 U.S. 405, 421 (1973). Courts must avoid mistaking the "'congressionally designed interplay between state and federal regulation' for impermissible tension that requires pre-emption under the Supremacy Clause." Hughes, 136 S. Ct. at 1300 (Sotomayor, J., concurring) (quoting Northwest Central, 489 U.S. at 518). In this Circuit, there is a "strong presumption against finding that the [State's] powers" are preempted by the FPA, Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 94 (2d Cir. 2012), legislation that was "drawn with meticulous regard for the continued exercise of state power," Rochester Gas & Elec. Corp. v. PSC of N.Y., 754 F.2d 99, 104 (2d Cir. 1985). That presumption may be overcome only if displacing state authority was Congress' "clear and manifest purpose." Wyeth v. Levine, 555 U.S. 555, 565 (2009).

**A**

An FPA field preemption claim was recently considered by the Supreme Court in Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288 (2016). A Maryland program required utilities to enter into a "contract-for-differences" with a favored power plant. 135 S. Ct. at 1294. Local utilities were required to

pay the shortfall if the plant cleared the capacity auction, but the clearing price fell below the state-determined contract price; if the clearing price exceeded the contract price, the plant paid the difference to the utilities.  Id. at 1295.  The Maryland program thus provided subsidies to the generator that were conditioned on the generator's sale of capacity into a FERC-regulated auction. Id. at 1292.  By guaranteeing a rate distinct from the auction clearing price, "Maryland's program invade[d] FERC's regulatory turf," and was therefore preempted.  Id. at 1297.

The Court cautioned, however, that "[n]othing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean generation through measures *untethered to a generator's wholesale market participation*."  Id. at 1299 (internal quotation marks omitted) (emphasis added). The Court expressly left open the viability of other measures to develop energy generation, such as "tax incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-regulation of the energy sector."  Id.  "So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable."  Id.

Plaintiffs argue that the ZEC program is indistinguishable from the Maryland program preempted in Hughes.  The program is said to be "expressly tethered to wholesale prices resulting from the NYISO auctions" because (1) "the state requires [utilities] to make up the difference between the state's rate and the FERC-approved market rates"; (2) "the subsidy varies inversely with FERC-approved auction rates"; and (3) "the subsidy is 'received' by the favored producers 'in connection with' the sale of electricity on wholesale markets."  Br. of Appellants 6, 32 (quoting 16 U.S.C. § 824d(a), 824d(e)).  Plaintiffs mischaracterize Hughes and the ZEC program.

The Maryland contract-for-differences program insulated generators from fluctuations in wholesale prices by guaranteeing that they would receive "the difference between . . . the clearing price" and the state-determined "price guaranteed in the contract for differences."  Hughes, 135 S. Ct. at 1295.  New York's scheme avoids (or skirts) the Hughes prohibition.  Until 2019, the ZEC price cannot vary from the social cost of carbon, as determined by a federal

interagency workgroup.  App'x 213–14, 266.  After 2019, the ZEC price is fixed for two-year periods, and does not fluctuate during those periods to match the wholesale clearing price.  Because the fixed ZEC price is capped based on an independent variable (the social cost of carbon), generators are exposed to market risk in the event that energy prices fall.  Moreover, the price may be fixed below the social cost of carbon, but only on the basis of *forecast* wholesale prices -- forecasts based on futures prices that FERC does not regulate, <u>Hunter v. FERC</u>, 711 F.3d 155, 157 (D.C. Cir. 2013) -- and there is no true-up to reconcile forecasts with actual rates.  The ZEC price also adjusts based on the amount of renewable energy generation in New York.  App'x 221 (CES Order at 137).  Accordingly, there is no support for Plaintiffs' contention that the "subsidy varies in almost exactly the same manner" as in <u>Hughes</u>.  Br. of Appellants 38.

Plaintiffs argue that <u>Hughes</u> preempts state programs if they are tethered to "FERC-regulated wholesale electricity prices."  Br. of Appellants 10; <u>see</u> <u>also</u> <u>id.</u> at 40–42, 48.  But the tether in <u>Hughes</u> is tied to "wholesale market *participation*," not prices, 136 S. Ct. at 1299 (emphasis added); the Maryland program was unlawful because it conditioned payment on auction sales.

As the district court held, <u>Rochester Gas</u> forecloses Plaintiffs' price-tethering theory.  It was argued in that case that the FPA preempted the PSC's policy of calculating intrastate retail rates by making a "reasonable estimate" of wholesale sales revenues.  <u>Id.</u> at 100–01.  We held that tying retail prices (which are under state jurisdiction) to estimates of wholesale revenues (which are under FERC's) is permissible because there is "a distinction between" a state impermissibly "regulating [wholesale] sales" and a state "reflecting the profits from a reasonable estimate of those sales" when acting within its jurisdiction.  <u>Id.</u> at 105.

Plaintiffs attempt to distinguish <u>Rochester Gas</u> on two grounds.  First, they argue that <u>Rochester Gas</u> addresses only retail rate-making, whereas the ZEC program addresses wholesale rate-making.  But that argument mischaracterizes the ZEC program, which avoids setting wholesale prices and instead regulates the environmental attributes of energy generation and in the process considers forecasts of wholesale pricing.

Second, Plaintiffs distinguish <u>Rochester Gas</u> on the ground that the ZEC program has a direct impact on the generators' "position toward" the wholesale markets. Br. of Appellants 39. But the same was true in <u>Rochester Gas</u>: the PSC policy allowed generators to keep operating, regardless of wholesale revenue, because recovery of costs was guaranteed through retail rates. What mattered in <u>Rochester Gas</u> was whether the retail rate adjustment, which factored in expected wholesale revenues, intruded on FERC's jurisdictional turf by compelling wholesale market participation. The analogous question here would be whether ZECs compel generators to make wholesale sales. We conclude that they do not.

Plaintiffs argue that the plants' owners are "Exempt Wholesale Generators" ("EWGs"), which are "legally required to sell their output into wholesale markets." Br. of Appellants 33. Accepting the allegations of the complaint as true (and ignoring the fact that neither Exelon nor LIPA have EWG status), Plaintiffs point to nothing in the CES Order that *requires* the ZEC plants to participate in the wholesale market. EWG status affords an exemption from certain regulations; but a ZEC plant may relinquish EWG status in order to sell directly to consumers (if it deems the tradeoff worthwhile) -- and still receive ZECs. As the district court concluded, a generator's decision to sell power into the wholesale markets is a business decision that does not give rise to preemption concerns. Special App'x 20-21. Accordingly, there is no support for Plaintiffs' assertion that the CES Order tethers the ZEC plants' receipt of ZECs to participation in the wholesale markets -- the "fatal defect" that doomed the contract-for-differences program in <u>Hughes</u>. 136 S. Ct. at 1299.

Citing <u>Allco Finance Ltd. v. Klee</u>, 861 F.3d 82 (2d Cir. 2015), Plaintiffs argue that the absence of a statutory compulsion for generators to sell into the wholesale market does not save a state program that would otherwise be preempted. <u>Allco</u> considered a Connecticut statute that arranged for utilities to enter into bilateral wholesale electricity contracts with renewable energy generators. The plaintiff argued that the statute "[c]ompe[lled] a wholesale transaction" between the generators and utilities and thus regulated wholesale sales. <u>Id.</u> at 97. We disagreed, because generators and utilities (rather than the state) made the ultimate decision to sign the contracts. <u>Id.</u> at 98, 100.

Plaintiffs contend that <u>Allco</u> supports their argument because the Court

emphasized that the contracts were subject to FERC evaluation as just and reasonable, whereas the ZEC transactions are not. Id. at 199. However, the evident reason that the contracts were subject to FERC review is that they were contracts for wholesale electricity sales, over which FERC has jurisdiction. Here, the only transactions New York compels are ZEC sales, and ZECs are sold separately from wholesale sales. Because there is no wholesale sale when ZECs change hands, FERC lacks jurisdiction to decide whether the ZEC transactions are just and reasonable. Allco is therefore inapposite.

**B**

Plaintiffs concede that the ZEC program "does not expressly mandate that the plants receiving ZEC subsidies bid into the NYISO auctions," Br. of Appellants 8; rather, they argue that the "practical effect" of the ZEC program is to regulate wholesale prices, id. at 35, and that a state law is preempted even if it does not formally regulate wholesale prices, if that is its practical effect. Plaintiffs rely on Northern Natural Gas Co. v. State Corporation Commission of Kansas, 372 U.S. 84 (1963), in which a Kansas law requiring an interstate pipeline to purchase gas ratably from producers was preempted by the Natural Gas Act ("NGA").[3] The state rule did not expressly regulate wholesale prices, but the Court reasoned that "our inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases . . . . The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, or for state regulations which would indirectly achieve the same result." Id. at 90-91 (citations omitted).

However, Northern Natural held that the Kansas law was preempted because it was "unmistakably and unambiguously directed at purchasers [i.e., interstate pipelines] who take gas in Kansas for resale after transportation in interstate commerce." Id. at 92. The Court emphasized that "our cases have consistently recognized a significant distinction," with "constitutional consequences, between conservation measures aimed directly at interstate purchasers and wholesales for resale, and those aimed at producers and production." Id. at 94.

---

[3] The Supreme Court has "routinely relied on NGA cases in determining the scope of the FPA." Hughes, 136 S. Ct. at 1298 n. 10.

This distinction between regulating purchasers and producers yielded the opposite result in Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas, 489 U.S. 493 (1989). Kansas hit on another way to encourage interstate pipelines to purchase additional Kansas-Hugoton gas, but did so by regulating the producers: unless they produced their allowable quantity of gas within a certain timeframe, they would lose the right to produce it later -- and of course the pipelines could not purchase gas unless it was produced. Id. at 497, 505. Relying on Northern Natural for the proposition that federal law preempts state regulations that have "either a direct or indirect effect on matters within federal control," the pipelines asked the Court to invalidate the Kansas rule "because it exert[ed] pressure" on them to "increase purchases from Hugoton producers." Id. at 497, 507.

FERC's brief to the Court argued that while Kansas "intended to influence" the pipeline's purchasing decisions, the state did "no more than fix[] limits on when producers may produce their gas" and therefore stayed within its jurisdiction. Northwest Central FERC Br. at *20. Furthermore, FERC regulation of the pipelines does not "protect [them] from the effect of state regulations that form the environment in which [they] conduct[] business within the state." Id. at *32.

The Supreme Court agreed: it would be "strange indeed" to hold that Congress intended to allow the states to regulate production, but only if doing so did not affect interstate rates. Northwest Central, 489 U.S. at 512-13. In Northern Natural, Kansas "crossed the dividing line . . . by imposing purchasing requirements on interstate pipelines," but in Northwest Central, the state achieved the same end result by "regulat[ing] production," a matter "firmly on the States' side of that dividing line." Id. The Court concluded that "we must take seriously the lines Congress drew in establishing [this] dual regulatory system," and therefore held that the Kansas law was not preempted. Id.

New York has kept the line in sight, and gone as near as can be without crossing it. ZECs are created when electricity is produced in a statutorily-defined manner, regardless of whether or how the electricity is ultimately sold. They are defined as "the zero-emissions attributes of one megawatt-hour of

17

electricity *production* by an eligible Zero Carbon Electric Generating Facility." App'x 254 (emphasis added). Accordingly, Northwest Central defeats Plaintiffs' argument premised on practical effect: even though the ZEC program exerts downward pressure on wholesale electricity rates, that incidental effect is insufficient to state a claim for field preemption under the FPA.

## C

FERC has confirmed that REC programs fall within the jurisdiction of the states, which is telling because RECs and ZECs share many similar characteristics. WSPP, Inc., 139 FERC ¶ 61,061 (2012), concerned an agreement that facilitated wholesale sales among 300 Canadian and American parties. The parties asked FERC to determine if it had jurisdiction over "unbundled" REC transactions. Id. PP 2, 5 & 9. FERC asserted jurisdiction over *bundled* REC transactions, in which "a wholesale energy sale and a REC sale take place as part of the same transaction," but disclaimed jurisdiction over unbundled REC sales. Id. "RECs are state-created and state-issued instruments certifying that electric energy was generated pursuant to certain requirements." Id. P 21. When RECs are unbundled, the payment is "not a charge in connection with a wholesale sale," does not "affect wholesale electricity rates," and therefore "falls outside FERC jurisdiction." Id. P 24.

As the district court observed: "Like a REC, a ZEC is a certification of an energy *attribute* that is separate from a wholesale charge or rate . . . . Like a REC, the purchase or sale of a ZEC is independent of the purchase or sale of wholesale energy. Like a REC, payment for a ZEC is not conditioned on the generator's participation in the wholesale auction; rather, RECs and ZECs are given in exchange for the renewable energy or zero-emissions *production* of energy by generators." Special App'x 27 (emphases in original). Plaintiffs argue that ZECs and RECs are nevertheless distinguishable for the purposes of preemption analysis, for two reasons.

First, Plaintiffs argue that, unlike RECs, the ZEC subsidy is tethered to wholesale prices. For reasons explained above, Plaintiffs' price-tethering theory is foreclosed by Hughes and Rochester Gas; furthermore, it mischaracterizes the ZEC program: ZEC prices are capped by the social cost of carbon, and may

18

adjust downwards in future years on the basis of *forecast* wholesale energy prices.  See supra Part V.A.

Second, Plaintiffs allege that ZECs are available only to generators that sell in the NYISO auctions, thereby guaranteeing that ZEC transactions are tied to the sale of electricity at wholesale.  True, ZEC plants may sell the electricity they generate into the wholesale auction, and all of them may well do so, but (as described above, supra at Part V.B), there is no support for Plaintiffs' argument that the CES Order *requires* ZEC plants to sell power into the wholesale market.  Under the program, the production of zero-emissions energy results in the creation of ZECs; how those plants sell their electricity is a business decision that does not raise preemption concerns.  Accordingly, Plaintiffs' two proposed distinctions fall flat.

Plaintiffs rely on a distortion of WSPP's holding.  First, they assert that FERC "was careful to limit its holding to the features of the three specific REC products before it."  Br. of Appellants 42.  However, WSPP clearly disclaims FERC jurisdiction over RECs when they are sold separately from electricity: the only REC feature that was dispositive was whether the REC was "unbundled" (sold separately from electricity) or "bundled" (sold together).  139 FERC ¶ 61,064, P 24.  There is no dispute that ZECs are similarly unbundled from electricity transactions.  Second, Plaintiffs quote FERC's observation that REC (and therefore presumably ZEC) transactions "could still fall under [FERC's jurisdiction" if they were "in connection with" or "affect[ed]" wholesale rates.  Br. of Appellants 43 (quoting 139 FERC ¶ 61,061 P 22).  But when FERC applied this jurisdictional standard two paragraphs later, it held (categorically) that unbundled REC transactions are not "in connection with a wholesale sale" and "do[] not affect wholesale electricity rates."  139 FERC ¶ 61,061 P 24.  Finally, Plaintiffs emphasize that the REC program had "no connection to an organized market with energy and capacity auctions."  Br. of Appellants 42.  But WSPP acknowledged that some REC recipients (like certain ZEC recipients) are EWGs, who are required to sell their output exclusively at wholesale.  139 FERC ¶ 61,061 P 9.  And several states addressed in WSPP required renewable generators to bid into wholesale auctions.  See West-Wide Must-Offer Requirements, 157 FERC ¶ 61, 051, PP 2–5 (2016) (western states subject to must-offer capacity mandate from 2001 to 2016 to address California energy crisis).  Yet WSPP nevertheless upheld

their REC programs.

It is telling that Plaintiffs cannot persuasively explain why FERC's holding regarding RECs does not apply equally to ZECs. We conclude that Plaintiffs have failed to state a plausible claim of field preemption.

**VI**

A state law may be conflict preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Oneok, 135 S. Ct. at 1595, or "interferes with the method by which the federal statute was designed to reach this goal," Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987). Given the FPA's dual regulatory scheme, "conflict-pre-emption analysis must be applied sensitively in this area, so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." Northwest Central, 489 U.S. at 515. So long as a state is "regulat[ing] production or other subjects of state jurisdiction, and the means chosen [are] at least plausibly . . . related to matters of legitimate state concern," there is no conflict preemption "unless clear damage to federal goals would result." Id. at 518, 522.

The FPA seeks to ensure, through FERC, that rates for wholesale sales remain just and reasonable, while simultaneously preserving state authority to regulate generation facilities and retail sales. 16 U.S.C. §§ 824d(a), 824(b). As explained above, the ZEC program regulates production: its stated aspiration is to "preserve existing zero-emissions nuclear generation resources as a bridge to the clean energy future," and to "prevent backsliding" that otherwise "likely could not be avoided." App'x 85, 229. Accordingly, ZEC program is not conflict preempted unless Plaintiffs can show that it would cause clear damage to federal goals.

Plaintiffs describe "the very goal of FERC's wholesale market design" as "competition from more efficient generators." Br. of Appellants 46. ZECs, Plaintiffs argue, "enable[] the unprofitable plants to keep dumping substantial amounts of electricity in the FERC markets for over a decade, even though the FERC-approved price signals should cause the plants to retire." Id.

20

Furthermore, Plaintiffs allege that the ZEC program "distort[s] price signals to all other wholesale generators by encouraging the favored generators to bid as price takers and thereby artificially depress market prices." Id.

However, FERC itself has sanctioned state programs that increase capacity or affect wholesale market prices, so long as the states regulate matters within their jurisdiction. Thus, states may "grant loans, subsidies or tax credits to particular facilities on environmental or policy grounds," Cal. PUC, 133 FERC ¶ 61,059, P 31 n.62, including when that makes clean generation "more competitive in a cost comparison with fossil-fueled generation" or "allow[s] states to affect" the price, S. Cal. Edison Co., 71 FERC ¶ 61,269, 62,080 (1995). States may "require retirement of existing generators" or construction of "environmentally-friendly units, or . . . take any other action in their role as regulators of generation," even though it may "affect[] the market clearing price." Conn. Dep't of Pub. Util. Control v. FERC, 569 F.3d 477, 481 (D.C. Cir. 2009); see also New England States Comm. on Elec. v. ISO New England Inc., 142 FERC ¶ 61,108, at 61,490 (2013) (LaFleur, Comm'r, concurring) ("[S]tates have the unquestioned right to make policy choices through the subsidization of capacity."); N.Y. State PSC, 158 FERC ¶ 61,137, 2017 WL 496267, at *11 (2017) (Bay, Comm'r, concurring) (observing that "all energy resources" receive subsidies, and that "an idealized vision of markets free from the influence of public policies . . . does not exist"). Similarly, FERC told the Supreme Court in Hughes that states are "free" to adopt such programs, "even if the price signals in the regional wholesale capacity market indicate that no [such] resources are needed." Hughes U.S. Amicus Brief at 33.

As explained above, Allco considered a state initiative to raise revenue for clean energy generators via long-term bilateral contracts, thereby "increas[ing] the supply of electricity" and "plac[ing] downward pressure on" wholesale prices. 861 F.3d at 89. But the Court concluded that "[t]his incidental effect on wholesale prices does not . . . amount to a regulation of the interstate wholesale electricity market that infringes on FERC's jurisdiction." Id. at 101[4]; see also

___

[4] Allco did not explicitly state whether its holding fell under a field or conflict preemption analysis. However, as the district court notes, Special App'x 33 n.22, there is no basis to conclude that an "incidental effect" on wholesale prices withstands field preemption, but not conflict preemption.

Northwest Central, 489 U.S. at 516 ("[R]egulating producers in such a way as to have some impact on the purchasing decisions and hence costs of interstate pipelines does not without more result in conflict pre-emption.").

Faced with this precedent, Plaintiffs concede New York's authority to enact "measures that may have an indirect effect on . . . price signals," but insist that "New York cannot directly distort the price signals that the auctions send by setting a higher, state-approved rate for wholesale electricity sales." Br. of Appellants 49. To the extent the ZEC program distorts an efficient wholesale market, it does so by increasing revenues for qualifying nuclear plants, which in turn increases the supply of electricity, which in turn lowers auction clearing prices. But that is (at best) an incidental effect resulting from New York's regulation of producers. In any event, ZECs do not guarantee a certain wholesale price that displaces the NYISO auction price.

FERC uses auctions to set wholesale prices and to promote efficiency with the background assumption that the FPA establishes a dual regulatory system between the states and federal government and that the states engage in public policies that affect the wholesale markets. Accordingly, the ZEC program does not cause clear damage to federal goals, and Plaintiffs have failed to state a plausible claim for conflict preemption.

## VII

The Commerce Clause authorizes Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "[T]he Clause was designed in part to prevent trade barriers that had undermined efforts of the fledgling States to form a cohesive whole following their victory in the Revolution." Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 807 (1976). Accordingly, the Supreme Court has inferred a "negative or dormant implication" to the Commerce Clause, which "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997) (internal quotation marks omitted).

However, the states retain "a residuum of power . . . to make laws

22

governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 669 (1981) (internal quotation marks omitted). Accordingly, a state law or regulation offends the dormant Commerce Clause only if it "(1) clearly discriminates against interstate commerce in favor of intrastate commerce, (2) imposes a burden on interstate commerce incommensurate with the local benefits secured, or (3) has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." Selevan v. N.Y. Thruway Auth. 584 F.3d 82, 90 (2d Cir. 2009) (internal quotation marks omitted).

Plaintiffs contend that the ZEC program violates the dormant Commerce Clause under the first two grounds: the program discriminates against interstate commerce by "deliberately propping up the in-state Exelon plants via a distortion of the interstate energy market," Br. of Appellants 52, and inflicts an undue burden on interstate commerce that outweighs any local interests by "impos[ing] market-distorting burdens that will drive out, and deter entry of, more cost-efficient, environmentally friendly out-of-state generators," id. at 53. We do not reach the merits of these claims because we conclude that Plaintiffs lack Article III standing.

The jurisdiction of the federal courts is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2. There is no case or controversy unless a plaintiff has standing to challenge the defendant's conduct. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Although the district court did not address whether Plaintiffs have standing on their dormant Commerce Clause claim, "[t]he doctrine of standing . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (internal quotation marks omitted).

Article III standing requires a plaintiff to have suffered an "injury in fact" that is "fairly traceable" to the defendant's challenged conduct and that is "likely to be redressed by a favorable decision." Spokeo, Inc. v. Robins, 138 S. Ct. 1540, 1547 (2016). At the pleading stage, "the plaintiff must clearly allege facts demonstrating each element." Id. (internal quotation marks and ellipsis

23

omitted). Accordingly, to show standing for their dormant Commerce Clause claim, Plaintiffs must demonstrate that their alleged injuries are traceable to (i.e., "the result of," City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983), or "a consequence of," Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 485 (1982)) discrimination against interstate commerce.

Plaintiffs allege that they are injured because the ZEC program allows "favored New York power plants to prevail in interstate competition against Plaintiffs" by underbidding them in the wholesale electricity markets. Br. of Appellants 49. Plaintiffs do not represent that they own any nuclear plants, in-state or out. Special App'x 40. If the PSC awarded ZECs in a non-discriminatory manner to out-of-state nuclear plants (as it may do in the future under the terms of the CES Order), there would be no abatement in the injury Plaintiffs claim to suffer from the general market-distorting effects of the ZEC program. In short, Plaintiffs' injuries "would continue to exist even if the [legislation] were cured" of the alleged discrimination. Johnson v. U.S. Office of Pers. Mgmt., 783 F.3d 655, 662 (7th Cir. 2015). Because Plaintiffs' asserted injuries are not traceable to the alleged discrimination against out-of-state entities, but (rather) arises from their production of energy using fuels that New York disfavors, they lack Article III standing to challenge the ZEC program.

**CONCLUSION**

The judgment of the district court is **AFFIRMED**.